**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JERRY ALAN REYNOLDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 1966** |
| **v.** | ) | |
| | ) | **Magistrate Judge Mason** |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Jerry Alan Reynolds ("Reynolds" or "claimant"), has filed a motion for summary judgment [18] seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). The Commissioner denied his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d) and 1382c(a)(3)(A). The Commissioner asks the Court to affirm the decision. We have jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, Reynolds' motion for summary judgment is granted.

## I. BACKGROUND

### A. Procedural History

Reynolds first filed for DIB and SSI on November 18, 2004. (R. 156-163.) The Social Security Administration ("SSA") treated his claims concurrently and denied his applications on February 28, 2005. (R. 79-80, 89-93.) Reynolds then filed a timely request for reconsideration (R. 94-95), which was denied on July 26, 2005. (R. 81-82,

96-104.)  Reynolds requested a hearing, but his request was dismissed as untimely. (R. 77-78.)  Reynolds sought review of that dismissal, which the Appeals Council denied on March 17, 2006.  (R. 87-88.)

Reynolds again filed for DIB and SSI on August 7, 2006 alleging disability beginning March 18, 2006 due to degenerative back disease, depression and chronic lung disease.  (R. 164-171.)  His applications were denied initially on November 17, 2006 (R. 83-84, 105-109), and upon reconsideration on May 10, 2007.  (R. 85-86, 110, 113-122.)  Reynolds then filed a timely request for a hearing.  (R. 123.)  On May 19, 2009, Reynolds appeared with counsel at a hearing before Administrative Law Judge David Thompson ("ALJ" or "ALJ Thompson").  (R. 32-73.)

On July 15, 2009, ALJ Thompson issued a written decision denying Reynolds' request for benefits.  (R. 12-31.)  Reynolds filed a timely request for review of ALJ Thompson's decision.  (R. 8.)  The Appeals Council denied Reynolds' first request for review on November 9, 2009 (R. 5-7), and his second request for review based on additional information on February 1, 2010.  (R. 1-4.)  Thereafter, the ALJ's decision became the final decision of the Commissioner.  *See Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  This action followed.

B.    **Medical History**

1.    **Records from Treating Physicians**

Emergency room records from St. Mary's Hospital in Streator, Illinois reveal that Reynolds suffered a work injury on August 30, 2001 while working at Missal Farmers Grain Co.  (R. 785.)  His left foot was caught in a grain auger resulting in lacerations to

the top of his foot, but no abnormalities.  (R. 786-77)

For the most part, the medical records are silent after the foot injury until Reynolds saw Dr. John C. Purnell for severe back pain in July and August of 2004.  (R. 501.)  On July 28, 2004, Reynolds reported that he did not think he could return to work due to his back problems and his personal problems.  (*Id.*)  Because Darvocet was not working, Dr. Purnell prescribed Ultram every four hours for pain.  (*Id.*)  Reynolds returned on August 24, 2004, at which point Dr. Purnell offered to refer him to physical therapy.  (*Id.*)  Dr. Purnell's notes indicate that Reynolds did not want the referral and Reynolds was directed to continue taking Ultram and not to work for two weeks.  (*Id.*)  On August 31, 2004, Reynolds reported that he was "hurting a lot" in his back and neck.  (*Id.*)  Dr. Purnell indicated that Reynolds was sober, "unlike the other day."  (*Id.*)  Reynolds stated he did not want to return to work, although Dr. Purnell was of the opinion that he probably did not qualify for social security disability.  (*Id.*)  Reynolds was told to continue physical therapy and Ultram and not to work for another two weeks.  (*Id.*)

On September 2, 2004, Reynolds was treated for breathing difficulties at the emergency room of St. Mary's.  (R. 360.)  Reynolds reported that he had been having breathing problems on and off for several months.  (R. 361.)  A chest x-ray showed mild hyperexpansion of the lungs which may represent air trapping from bronchiolitis or early changes of chronic pulmonary disease ("COPD"), "possibly work related."  (R. 371-72, 462.)  The records from his visit also reveal a history of "back problems."  (R. 360.)  Reynolds was discharged the next day, and ordered to return for more extensive respiratory testing and an evaluation of his chronic back pain.  (R. 364.)  He was also

ordered not to return to work until he was seen by Dr. Susan Evers.  (*Id.*)

The results of the follow-up testing were as follows.  A pulmonary function test dated September 7, 2004 showed normal FEV1 and mildly reduced FVC ratio, and "mild obstructive defect with good response to bronchodilators with associated gas-trapping." (R. 370.)  This result was "very consistent with asthma."  (*Id.*)  A September 11, 2004 MRI of the cervical spine revealed "moderate degenerative disc disease seen at the C5-C6 level and mild moderate degenerative disc disease seen at the C4-C5 level."  (R. 366.)  There was diffuse posterior osteophyte formation at the C4-C5 level with associated diffuse disk bulging/protrusion causing flattening of the thecal sac anteriorly in contact with the anterior margin of the cervical cord.  (*Id.*)  At the C5-C6 level, there was diffuse disc protrusion/herniation with associated posterior osteophyte formation in contact with the anterior margin of the cervical cord.  (*Id.*)  Mild cord flattening could not be excluded.  (*Id.*)

An MRI of the lumbar spine was conducted the same day and revealed diffuse disc bulging/protrusion at the L4-L5 and L5-S1 level.  (R. 367.)  The L5-S1 level also had superimposed left paracentral disc herniation extending inferior to the disc space. (*Id.*)  "Very significant disc bulging" was seen at the L2-L3 and L3-L4 levels and degenerative disc disease was seen throughout the lumbar spine.  (*Id.*)

Reynolds underwent physical therapy at St. Mary's throughout September 2004. (R.438-450.)  The records from the sessions reveal marginal back extension and mobility, and unsatisfactory back rotation and hamstring flexibility.  (R. 445.)

Reynolds saw Dr. George E. DePhillips on September 23, 2004.  (R.426.) According to Dr. DePhillips' notes, claimant suffered a work related injury in August

4

2001 and experienced neck and lower back pain ever since. (*Id.*) Dr. DePhillips reviewed a MRI scan of the cervical and lumbar spines (presumably the 9/11/04 MRI) and noted degenerative disc disease at C4-C5, C5-C6 and L5-S1. (*Id.*)

On September 27, 2004, Dr. Evers concluded that claimant needed at least six weeks off of work due to "temporary full disability." (R. 416.) According to Dr. Evers, Reynolds needed to sit at a desk in a clean environment and do office tasks not requiring exertion. (*Id.*) She was unsure whether he would ever get better. (*Id.*) Six weeks later, Reynolds' fiancé called St. Mary's asking for another note to his employer regarding his ability to work. (R. 414.) It is not clear from the progress notes whether Dr. Evers granted that request, although other records reveal that Reynolds never returned to work after the trip to the emergency room in September 2004. (R. 789.)

In early October 2004, Dr. DePhillips referred claimant to Dr. Gary L. Koehn at the Pain Management Center of the Community Hospital of Ottawa for evaluation and treatment of degenerative bulging cervical disc disease, including a trial of epidural steroid injections. (R. 422.) Reynolds reported pain in his "bilateral posterior neck, upper back, low cervical upper thoracic segments and paraspinouius region." (*Id.*) A shoulder gram showed some symmetric loss of range of motion. (R. 423.) Dr. Koehn noted a number of co-morbid medical problems that influenced treatment strategies, including pulmonary and psychiatric problems, and polysubstance abuse. (R. 422-24.) Dr. Koehn indicated that he would not pursue further evaluation or treatment until he learned more about these problems. (R. 424.)

Reynolds was treated for depression by Dr. Michael Glavin at Community Hospital of Ottawa in Illinois on November 2, 2004. (R. 332-33.) Claimant reported that

he had been "depressed 4-5 years, and maybe longer." (R. 332.) He also reported mood swings, poor appetite, and a decrease in motivation, concentration and memory, but denied being suicidal. (*Id.*) Reynolds claimed that he had constant back pain and also that he had been told he cannot go back to work. (*Id.*) Dr. Glavin found Reynolds' "mood and affect depressed and flat" and noted psychomotor retardation. (R. 333.) Reynolds' scored a 37 on the Beck Depression Inventory, which is consistent with severe depression. (R. 680-82.) Dr. Glavin diagnosed Reynolds with major depression, but ruled out bipolar disorder. (R. 333.) He also assessed back pain and COPD. (*Id.*) Dr. Glavin's treatment plan included prescriptions for Cymbalta and Risperdal, and a return visit in five weeks. (*Id.*) In an outpatient counseling session with a mental health therapist on December 1, 2004, claimant continued to complain of insomnia, sadness, and severe anxiety, among other things. (R. 626.)

On December 6, 2004, Reynolds visited the Midwest Regional Pain Center for a comprehensive pain evaluation and treatment. (R. 378-82.) Reynolds reported that his neck and back pain started over 20 years ago. (R. 378.) Prolonged standing, walking and turning his head aggravated his pain. (*Id.*) The report indicates that sensory and motor function of the upper and lower extremities was normal, but he had a decreased range of motion in his neck. (*Id.*) Reynolds' pain was found to be consistent with lumbar and cervical disc disease. (R. 379.) Vicodin, steroid injections, and physical therapy were recommended. (R. 381.)

Reynolds saw Dr. Glavin again on December 30, 2004, a day after he was admitted to the "Choices" psychiatric unit of the Community Hospital of Ottawa due to increased depression and suicidal ideations. (R. 334.) Reynolds reported that he

recently discovered his girlfriend with another man and got very upset.  (*Id.*)  Despite having been sober for seven months, he ended up drinking seven beers, after which he became more depressed.  (*Id.*)  He thought of driving his car and crashing it.  (*Id.*)  Reynolds reported a poor appetite (he had not eaten in three days), a lack of motivation, and mood swings.  (*Id.*)  At the time, he used marijuana daily.  (*Id.*)  Dr. Glavin again noted pyschomotor retardation and also noted that Reynolds suffered from withdrawal symptoms such as tremors.  (*Id.*)  He diagnosed major depression, as well as alcohol and marijuana abuse.  (R. 335.)  Reynolds was discharged to home on January 3, 2005.  (R. 526.)

On the same day he was discharged from Choices, Reynolds was taken to the emergency room at St. Mary's for a drug overdose/suicide attempt.  (R. 342.)  The records reveal that his family witnessed him take a handful of vicadin and methadone with alcohol.  (R. 343.)  At the hospital claimant stated, "why don't you just let me die." (R. 344).  He initially denied previous psychological problems or care, but eventually admitted to his recent stay at Choices.  (*Id.*)

Reynolds was transferred back to Choices on January 5, 2005.  (R. 510.)  He was treated with individual and group therapy.  (R. 508.)  He was discharged on January 7, 2005 and advised to stay sober.  (R. 509.)  He was prescribed prozac and valium, and was told to continue his medications for his medical conditions, including advair discs, albuterol, methadone and pantoprazole.  (*Id.*)  The records reveal that Reynolds continued to partake in individual therapy sessions at Choices and see Dr. Glavin for medication management following his discharge and through September of

2005.  (R. 641-54.)

At a January 27, 2005 follow up appointment with Dr. Koehn regarding pain management, claimant continued to complain of back pain and a tingling down the bilateral upper extremities.  (R. 420.)  Claimant declined epidural steroid injections.  (*Id.*)

On June 2, 2005, claimant saw rehabilitation consultant Richard T. Fisher for a vocational rehabilitation evaluation.  (R. 770-72.)  In addition to reviewing the medical records, Fisher questioned Reynolds about his functional capacities.  (R. 770.) According to the evaluation, Reynolds indicated generally that he was able to function in the "light work category," with the following functional capacities: frequently lift ten pounds and occasionally lift twenty pounds; occasional walking, bending, squatting and reaching away from the body; sit and stand for ½ hour duration before change of position; and no climbing or lifting above the shoulders.  (R. 770-71.)  Given his physical limitations, COPD, depression and substance abuse, and a poor labor market in Streator, Illinois, Fisher concluded that it was not reasonable to think that Reynolds could find employment.  (R. 772.)

On June 13, 2005, Dr. Evers completed a form regarding Reynolds' condition in response to a request from the Bureau of Disability Determination Services ("DDS"). (R. 575-78.)  Dr. Evers reported that Reynolds suffered from extensive pain throughout the mid and lower back, numbness in feet and legs, and a stooped posture, with difficulties "straightening up." (R. 575.)  Dr. Evers also reported that he needed to change positions more than once every two hours.  (R. 576.)  In a form titled "Respiratory Report," Dr. Evers indicated that Reynolds could lift no more than twenty-five pounds and that his walking and carrying should be very limited.  (R. 578.)

On August 29, 2005, Reynolds saw Dr. A. Martinez at Streator Medical Center. (R. 774.) Dr. Martinez documented a history of COPD, chronic low back pain, secondary to degenerative disc disease, alcoholism, polysubstance abuse and depression. (*Id.*) Reynolds complained of decreased energy, poor sleep, poor appetite and generalized feelings of sadness. (*Id.*)

On September 1, 2005, Reynolds underwent another pulmonary function test at St. Mary's. (R. 692.) That test revealed "mild obstructive defect with good response to bronchodilator with associated gas trapping and normal diffusion features consistent with reactive airway disease." (*Id.*) As compared to the test in 2004, there was significant worsening in the spirometry. (*Id.*)

On December 15, 2005, Reynolds went back to see Dr. DePhillips who again noted degenerative disc disease. (R. 778.) Reynolds reported that he underwent a lumbar epidural steroid injection (although it is unclear when or where), which gave him temporary relief only. (*Id.*) Dr. DePhillips explained that surgery on his back would involve a multiple level fusion. (R. 778)

Reynolds saw Dr. Robert E. Eilers on January 5, 2006 at Physical Medicine and Rehabilitation Associates. (R. 789.) Reynolds reported that he had not been able to feel his toes since his 2001 foot injury and that his back hurts all the time. (*Id.*) Reynolds stated that he could lift ten pounds, sit thirty minutes, stand a half an hour, walk fifteen minutes, and drive twenty minutes. (R. 790.) A physical examination revealed limitations in his flexion, extension, and rotation. (R. 791.) Dr. Eilers concluded that Reynolds will continue to have permanent deficits as a result of his back and pulmonary problems. (R. 792.)

On January 27, 2006, claimant underwent another MRI of the lumbar spine at OSF Saint James Medical Center.  (R. 768.)  The test showed multilevel intervertebral disc disease without significant central canal stenosis, foraminal stenosis or nerve root impingement.  (R. 769.)  There were nonspecific inflammatory changes of the leftward facet and pedicles at L3 and L4, which could be related to previous epidural injection, trauma or even infection.  (*Id.*)

In a note dated May 18, 2009, Dr. P. Vadhanasindhu wrote that Reynolds has been under his care since February 17, 2006.  (R. 324.)  According to Dr. Vadhanasindhu, Reynolds suffers from COPD, degenerative disc disease and depression.  (*Id.*)  His prognosis is fair to poor and his condition has been deteriorating since February 2006.  (*Id.*)  He reports pain and limitations of motion.  (*Id.*)  Records from St. Mary's also reveal that Reynolds suffered a seizure in June of 2008, although the cause is not noted.  (R. 1238.)

## 2. State Agency Consultants

### a. Physical Evaluations

On October 18, 2006, Reynolds was evaluated by Dr. Phillip Budzenski  (R. 1178-82.)  Reynolds complained of low back pain in the center of the back radiating to the neck and down to the legs, which began after his 2001 work injury.  (R. 1178.)  He reported that he was on pain medication.  (*Id.*)  He stated that he was diagnosed with COPD in September 2004 and smoked a pack of cigarettes a week for the last 15 years.  (*Id.*)  With respect to his depression, Reynolds reported some improvement with Celexa.  (*Id.*)  Reynolds displayed a normal gait and the results of the physical exam

were primarily unremarkable.  (R. 1179-82.)  Dr. Budzenski did note limited forward flexion and extension of the lumbar spine.  (R. 1180.)

Dr. Budzenski assessed claimant with "allegation of COPD without findings on examination," a history of tobacco and street drug abuse, a "history of depression apparently on treatment," and an "allegation of back injury with radicular findings."  (R. 1182.)  He further noted that the range of the lumbar spine was well-preserved, the deep tendon reflexes were brisk, and the sensory and motor modalities were preserved. (*Id.*)  Therefore, he found no clinical evidence of nerve root impingement.  (*Id.*) According to Dr. Budzenski, claimant could perform medium work eight hours a day with at least occasional heavy work.  (*Id.*)  He would limit the claimant's operation of automotive equipment, dangerous equipment, climbing or working around unprotected heights due to narcotics usage.  (*Id.*)  He would also limit overhead work to occasional, given claimant's limits in lumbar extension.  (*Id.*)

On November 16, 2006, Dr. Francis Vincent completed an evaluation of Reynolds' physical residual functional capacity for DDS.  (R. 1201-08.)  He found that Reynolds had a mild loss of motion in his lumbar spine, full motion in his cervical spine, and that his gait was normal and unassisted.  (R. 1202.)  He noted that an MRI from 2004 confirmed degenerative bulging disc disease.  (*Id.*)  Dr. Vincent determined that claimant could occasionally lift twenty pounds and frequently lift ten pounds, stand and/or walk about six hours in a normal eight hour work day, and sit about six hours in an eight hour work day.  (*Id.*)  Reynolds could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but could only occasionally climb, ladders, ropes, and scaffolds due to the pain in his cervical spine.  (R. 1203.)  Dr. Vincent

11

concluded that Reynolds should never lift any weight above chest level bilaterally. (R. 1204.) Dr. Vincent also found that Reynolds' COPD was "under good control" and his lungs were clear. (R. 1208.) Dr. Vincent considered Reynolds' complaints of pain in making all of his RFC assessments. (*Id.*)

On March 22, 2007, Dr. Sarat Yalamanchili evaluated Reynolds after a referral from DDS. (R. 1209-11.) Reynolds complained of low back pain and Dr. Yalamanchili noted that he wore a brace at all times except when sleeping. (R. 1209) Reynolds told the doctor that he was taking three or four Vicodin a day, that he could not walk more than a block, and that he uses an inhaler. (*Id.*) A back examination showed bilateral spinal point tenderness and muscle spasms, as well as marked impairment of range of motion of the lumbar spine. (R. 1211.) Dr. Yalamanchili noted that Reynolds had difficulty lying flat on the examination table and walked bent forward (R. 1210-11.) A chest examination revealed dyspnea on exertion, possibly related to his history of COPD, with mild expirative wheezing. (*Id.*) Further pulmonary function testing on April 16, 2007 demonstrated a moderate obstruction. (R. 1213.)

On May 2, 2007, Dr. Ernst Bone, found that Reynolds' RFC limited him to sedentary work. (R. 1229.)

### b. Mental Evaluations

On October 16, 2006, Reynolds was evaluated by clinical psychologist Erwin J. Baukus at the request of DDS. (R. 1172-77.) Reynolds explained that he had two psychiatric hospitalizations, after which he underwent outpatient treatment. (R.1174.) Reynolds reported depressive symptoms such as appetite disturbance, sleep disturbance, decreased energy, and difficulty concentrating. (R. 1175.) He said he

could meet his personal hygiene needs, takes care of household chores and does his own grocery shopping.  (*Id.*)  He reported that he regularly attends church and visits with friends and family both at his home and away from his home.  (*Id.*)  Reynolds displayed some short term memory problems and slightly impaired judgment.  (R. 1176-77.)  After the evaluation, Dr. Baukus assessed chronic pain syndrome with depression.  (R. 1177.)

On November 15, 2006, state agency psychological consultant Jerrold J. Heinrich completed a psychiatric review technique form and assessed Reynolds' mental residual functional capacity.  (R. 1183-1200.)  Dr. Heinrich found that claimant had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation.  (R. 1193.)  He assessed claimant with depression, substance abuse and chronic pain syndrome.  (R. 1186, 1189, 1191.)  According to Dr. Heinrich, claimant retained the mental and behavioral capacity to do simple tasks in a low-stress environment, with less than frequent interactions with others and infrequent adjustments to routine.  (R. 1199.)  This assessment was affirmed on April 24, 2007 by another state agency consultant.  (R. 1212-21.)

### C.    Claimant's Testimony

Reynolds provided the following testimony at the May 19, 2009 hearing before ALJ Thompson.  At the time of the hearing, Reynolds was 45 years old, 6'1", 175 pounds, unmarried, and right-handed.  (R. 36-37.)  He has two children, a twenty year old son with mental disabilities and a fifteen year old daughter.  (R. 37.)  He lives with his son in a single-story house with three steps.  (*Id.*)  Reynolds has a valid driver's

license and drives about 10 miles a week.  (R. 51.)  However, Reynolds' sister drove

him to the hearing so that he could make adjustments to his posture during the 45-

minute ride.  (R. 38.)  Otherwise, he would have had to stop twice during the trip.  (*Id.*)

Reynolds testified that he has a tenth-grade education and failed the GED three

times.  (R. 41.)  He took special education classes in school.  (R. 42.)  He can read and

write English, but has a hard time understanding things.  (*Id.*)

Reynolds testified that he injured his foot and back in 2001 when he got caught in

a grain auger at work.  (R. 39-40.)  His employer took the position that his pre-existing

back condition was merely exacerbated by the incident and gave him nothing.  (R. 41.)

In 2004, he had trouble breathing due to exposure to grain dust and he was diagnosed

with COPD.  (R. 40.)  For that injury, he recovered $62,000.  (R. 40-41.)  He has not

worked since August 2004.  (R. 42.)  At the time of the hearing, Reynolds had no

income other than general assistance from Redding Township, food stamps, and the

use of some of his son's SSI.  (R. 39.)

Reynolds testified that he was on twelve different medications at the time of the

hearing.[1]  (R. 42).  The medications help cure the pain, but do not take the pain

completely away.  (R. 43.)  He uses an inhaler about two times a day.  (R. 57.)

Reynolds testified he wears a brace every day and was wearing it at the hearing.

(R. 55.)  He has worn the brace since February of 2008 because, without it, he has

excruciating pain.  (R. 56.)  According to Reynolds, the pain in his back sometimes

---

[1] The medications are listed in Exhibit 23E.  (R. 308).  That document reveals that Reynolds was taking Morphine and Hydrocodone for pain relief, Proventil, Singulair, and Advair for COPD, Famotidine for stomach problems, Diazepam for anxiety, Lisonopril for hypertension, Meclizine for dizziness, and Citalopram and Effexor for depression.  (R. 308.)  In addition, Reynolds testified that his doctor recently prescribed him Paxil.  (R. 43.)

causes his legs to go rubbery and he has to grab a hold of something.  (R. 44.)  Often, the pain is so severe that he has to sit down because he is afraid he will fall.  (R. 56.) Three months before the hearing he fell unconscious after going up and down the stairs to his basement to do laundry.  (R. 56-57.)  His pain has gone from a seven on a scale of ten in 2004 to a nine out of ten at the time of the hearing.  (R. 44-45.)  On good days, the pain is at a six, and on bad days it is at a nine.  (R. 46.)  He has about fifteen bad days each month.  (*Id.*)  His back pain keeps him from sleeping and he averages about three or four hours of sleep per night.  (R. 62.)

In terms of his functional limitations, Reynolds said he is not able to sit in one spot for a long time before he has to stand up, or, if he is in pain, to lie down.  (R. 47.) Specifically, Reynolds testified that he can sit for three and a half or four hours before having to lie down if he is occasionally able to stand and stretch.[2]  (R. 50.)  If he is able to lie down for about an hour, he can then return to a sitting position for three to four hours.  (R. 50-51.)  Reynolds testified that he has to lie down three or four times a day. (R. 61.)  Reynolds claimed he can stand for forty-five minutes at most and can walk no more than a block before needing to stop and catch his breath or use his inhaler.  (R. 49.)  Reynolds also testified that he cannot lift more than ten pounds on his doctor's orders.  (R. 47.)  He said that it is difficult to be around environmental irritants, such as dust.  (R. 49.)

As for mental limitations, Reynolds testified that he "can't really read a paragraph and understand what it really means" and that he has trouble writing.  (R. 48.)  He does

---

[2]  The record reflects that Reynolds stood occasionally during his testimony before the ALJ.  (R. 49.)

not like to talk on the phone and avoids crowds due to resulting anxiety attacks.  (*Id.*)

Reynolds does not like to leave his house because "everything's just getting on top of

my shoulders and weighing me down."  (R. 58.)  In early May 2009, he did not leave his

house for two days.  (*Id.*)  The recently prescribed Paxil is to treat the anxiety he feels in

public.  (*Id.*)

Reynolds prepares meals for himself, but sometimes requires assistance from

his son when he can no longer stand.  (R. 51.)  He takes care of his personal hygiene

needs, such as bathing and dressing, and does the laundry, vacuuming, dusting,

mopping and sweeping.  (*Id.*)  He is capable of taking care of his finances, although at

the time of the hearing he was behind on certain bills due to a lack of income.  (R. 51-

52.)

 When asked about marijuana abuse, Reynolds described his use as a "one trial

deal" and said that he last smoked in 2004.  (R. 52.)  He admitted to alcohol abuse in

the past.  (R. 53.)  He last drank on his birthday in January of 2009.  (*Id.*)  He only had a

few beers.  (*Id.*) Reynolds smokes about a half a pack of cigarettes a day.  (R. 54.)  To

fund his smoking habit, Reynolds collects cans.  (R. 55.)

Reynolds testified that his inability to work or provide for himself has put him in a

deep depression.  (R. 59.)  He has attempted suicide twice, most recently about seven

months prior to the hearing.  (*Id.*)  Reynolds did not seek medical attention from his

doctor after the most recent suicide attempt, but spoke to a social worker from a state

program called Home Health Nurses.  (*Id.*)

Mr. Reynolds no longer has to apply for jobs to receive his general assistance

from Redding Township.  (R. 60.)  His caseworker allowed him to stop seeking work

after she learned that employers could not afford the liability insurance necessary to employ him. (*Id.*) In order to receive his $225 a month, however, he must sweep and mop the floor for 45 minutes to an hour at the township two or three times a month. (*Id.*) The chores hurt his back, but he continues to do the work because he fears losing the monthly payment. (*Id.*)

### D. Vocational Expert's Testimony

Vocational expert Brian Paprocki ("VE") also testified at the hearing. The ALJ asked the VE to consider a hypothetical person with the same age, education, and past relevant work as claimant. (R. 67.) The ALJ then asked the VE to assume that the individual was limited to light work with frequent balancing, kneeling, and crawling, occasional climbing, stooping, and crouching, who had to avoid concentrated exposure to fumes, odors, dusts, and gases, and was limited to complex tasks with only occasional contact with the public, coworkers, and supervisors. (*Id.*) The VE said such limitations would preclude the hypothetical person from performing claimant's past work as a grain elevator operator. (*Id.*) Such a person could, however, perform light work as a surveillance system monitor, parking lot cashier, folder at a commercial laundry, office helper, or photocopy machine operator. (R. 68-69.)

The ALJ then asked the VE to consider a second hypothetical person with the same age, education, and past relevant work as claimant. (R. 69.) This second individual was limited to sedentary work with a sit/stand option. (*Id.*) The individual was further limited to occasional postural activities with no ropes, ladders, or scaffolds, no concentrated exposure to fumes, odors, dusts, or gases, limited to less than complex tasks, and limited to only occasional contact with the public, coworkers, and

supervisors.  (*Id.*)  The VE testified that the individual could work as a surveillance system monitor, as well as a fishing reel assembler or rotor assembler, both of which are unskilled sedentary jobs that allow latitude for positional change.  (R. 70.)  When asked whether a person who had to miss four days of work a month for whatever reason was employable, the VE responded that four days would be double the amount of absences an employer would be willing to accommodate.  (*Id.*)

Reynolds' attorney also questioned VE Paprocki.  He first asked whether an individual whose postural requirements required him to lie down for a minimum of one hour in an eight-hour shift could do any of the jobs the VE had previously mentioned. (R. 71.)  The VE responded that "all competitive employment" would be precluded in that situation.  (*Id.*)  When asked whether a person who had to change postures twice every two hours would be precluded from competitive employment, the VE said no.  (R. 71.)  The VE also explained that a person had to be productive 80-90% of the work day to be eligible for competitive employment.  (R. 72.)

### E.    Claimant's Sister's Testimony

Claimant's sister Donna Janney testified that she sees her brother once or twice a week.  (R. 64.)  She said that he walks "funny" and is always wearing his brace.  (*Id.*) Janney observed her brother fall in February of 2009.  (R. 64-65.)  She also testified that he has a lot of trouble breathing.  (R. 65.)  According to Janney, her brother is depressed because he cannot work or pay the bills.  (*Id.*)  She knows he has friends and has seen them on occasion, but does not know how much he socializes.  (*Id.*)  She believes her brother cares for his son "as best as he can."  (*Id.*)

### F.    Submissions from Third Parties

The record contains a few letters from Reynolds' neighbors and friends.  (R. 321-23.)  His neighbors wrote that they never see him without his brace and that "he doesn't seem to be able to do too much."  (R. 321.)  Carl Winston, a friend of four years, stated that Reynolds can hardly breathe some days and can barely walk without his brace.  (R. 322.)  Richard Knott indicated that he could never hire Reynolds because he is not fit to do any type of work.  (R. 323.)

## II.   LEGAL ANALYSIS

### A.   Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  We must consider the entire administrative record, but we will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Id.*  While the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence... [and to enable] us to trace

the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*per curiam*) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.      Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether claimant is "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski*, 245 F.3d at 886.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that the "claimant is capable of performing work in the national economy."  *Id*.

Here, ALJ Thompson followed this five-step analysis.  At step one, ALJ Thompson found that the claimant has not engaged in substantial gainful activity since March 18, 2006, the alleged onset date.  (R. 18.)  At step two, the ALJ found that claimant has the following severe impairments: "degenerative back condition, COPD, and depression."  (*Id*.)  At step three, the ALJ determined that Reynolds does not have

an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18-20.)

The ALJ next determined that Reynolds has the residual functional capacity to "perform sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a) with a sit/stand option, occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, no climbing of ladders, ropes, or scaffolds, no concentrated exposure to fumes, odors, dust, and gases, and the work must involve less than complex tasks and no more than occasional contact with the public, coworkers, and supervisors." (R. 20.) At step four, the ALJ found that Reynolds cannot perform his past relevant work as a grain elevator operator. (R. 29.) Finally, at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Reynolds could perform based on his age, education, work experience, and residual functional capacity to perform sedentary work. (*Id.*)

Claimant now argues that the ALJ (1) erred in finding that he did not meet a listing; (2) failed to consider the effect of pain on his ability to work; and (3) failed to account for all of his exertional and non-exertional limitations in the hypotheticals posed to the VE. Claimant also argues that the jobs stated by the VE were not consistent with claimant's limitation to perform less than complex tasks.

Before addressing these arguments, we note, as did the Commissioner, that claimant raises a number of arguments that are difficult to follow, and which he fails to fully develop. It is well settled that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Holm,* 326 F.3d 872, 877 (7th Cir. 2003) (internal quotation marks omitted). Only one of

claimant's undeveloped arguments warrants our attention. Claimant appears to argue

that the ALJ erred in determining that his alleged onset date was March 18, 2006.

According to claimant, the ALJ should have considered the alleged onset date to be

"August of 2004, when he stopped working." (Pl.'s Mot. at 5.) Contrary to claimant's

assertion, the ALJ did not independently determine the alleged onset date. Instead, the

date came from claimant's own applications. (R. 164, 169.) Further, the ALJ was not

required to determine the actual onset date because he did not determine that the

claimant was disabled. *See Scheck v. Barnhart*, 357 F.3d 697 (7th Cir. 2004) ("The ALJ

did not find that [claimant] was disabled, and therefore, there was no need to find an

onset date.").

### C. The ALJ's Step Three Determination is Supported by Substantial Evidence and Free from Legal Error.

Reynolds first argues, albeit in a disorganized manner, that the ALJ omitted

significant and material evidence when he determined that Reynolds' impairments did

not meet or medically equal a listed impairment. We disagree.

To meet the requirements of a listing, a claimant must have a medically

determinable impairment that satisfies all of the criteria in the listing. 20 CFR §

404.1525; *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004.) An impairment medically

equals a listing if it is at least equal in severity and duration to the criteria of any listed

impairment. 20 CFR § 404.1526. Under certain circumstances, a perfunctory analysis

at Step Three may require remand. *Rice*, 384 F.3d at 370; *Brindisi v. Barnhart*, 315

F.3d 783, 786-87 (7th Cir. 2003).

Here, after finding that claimant's degenerative disc disease, depression and

COPD amounted to severe impairments, the ALJ thoroughly examined the listings for each impairment. First, with respect to listing 1.04, "disorders of the spine," the ALJ noted that there is no evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis leading to pseudoclaudication and inability to ambulate. Indeed, the MRI from January 2006 showed multilevel intervertebral disc disease without significant central canal stenosis, foraminal stenosis or nerve root impingement. (R. 769.) Dr. Budzenski also indicated that there was no clinical evidence of nerve root impingement. (R. 1182.) Further, while pain and ambulatory difficulties are well documented, the ALJ noted that there is no evidence of motor loss with sensory reflex loss or positive straight-leg raising test. As such, the ALJ did not err in determining that claimant did not meet or medically equal the listing for disorders of the spine.[3]

With respect to listing 3.02(A) for COPD, the ALJ properly concluded that claimant's FEV1 values were not sufficient to meet or equal the listing. (*See* R. 370, 692 showing normal to only mildly reduced FEV1 levels.)

Finally, the ALJ examined listing 12.04, "affective disorders," and conducted a detailed analysis of the criteria before determining that Reynolds did not meet or medically equal the listing. Because Reynolds has complained of and been treated for depression, the ALJ easily concluded that he satisfied the A criteria. But, with respect to the B criteria, the ALJ found that the claimant had established at most a mild restriction of activities of daily living (he could meed his personal hygiene needs,

---

[3] We find no basis for claimant's argument that the ALJ failed to consider his cervical spine impairment. Naturally, this issue was encompassed by the ALJ's discussion of his degenerative disc disease.

grocery shop, do household chores); only mild difficulties in maintaining social functioning (he attended church and visited with friends despite complaints of anxiety); and moderate difficulties in maintaining concentration, persistence or pace (he displayed some short-term memory problems). Additionally, Reynolds failed to establish episodes of decompensation of extended duration or the requisite C criteria.

Each of the ALJ's conclusions at Step Three was well supported and free from legal error. As such, we decline Reynolds' request for remand on this issue.

### D. The ALJ Erred in Making his Credibility Finding.

Claimant next argues that the ALJ failed to consider the effect of pain on his ability to work. Because this issue goes hand-in-hand with the ALJ's credibility determination, or as explained below, lack thereof, we address the issues concurrently.

It is well settled that the ALJ is in the "best position to see and hear the witnesses and assess their forthrightness" and, as such, a reviewing court affords the ALJ's credibility finding special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The court may only disturb a credibility finding if it is "patently wrong," that is, unreasonable or unsupported. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Despite this deferential standard of review, Seventh Circuit precedent confirms that an ALJ must explain his decision in such a way that allows the reviewing court to determine whether he reached the decision in a rational manner, logically based on his specific findings and the evidence in the record. *McKinzey v. Astrue,* 641 F.3d 884, 890 (7th Cir. 2011) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004) (noting that the "court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding.")).

Our concern with ALJ Thompson's credibility finding is simple; he did not make one.  After determining that the claimant's severe impairments did not meet or equal a listing, ALJ Thompson provided a thorough recitation of the hearing testimony.  (R. 20-22.)  After doing so, the ALJ concludes that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 22.)  (The ALJ had stated his RFC finding in the preceding heading.)  This statement is followed by a verbatim regurgitation of the extensive medical records and consultative examinations.

Entirely absent from the ALJ's RFC analysis is the requisite explanation as to which of claimant's statements he found credible, which he discounted and why.  Of particular importance here is the claimant's statements regarding pain.  Claimant's complaints of pain are well documented throughout the record and were found to be consistent with degenerative disc disease.  (R. 379.)  Additionally, at the hearing, claimant testified that his pain is often so severe that he has to sit down for fear of falling.  (R. 56.)  He also testified that his pain medication helps, but does not entirely relieve his pain.  (R. 43.)  The ALJ failed to even minimally address whether claimant's complaints of debilitating pain were credible, and if so, how the pain would affect his ability to work.

Claimant also testified that he has to lie down three or four times a day.  (R. 61.)  When claimant's attorney asked the VE whether the need to lie down for a minimum of one hour in an eight-hour day would preclude any jobs, the VE responded that "all

competitive employment" would be precluded. (R. 71.) As such, this issue is

determinative and requires an explanation as to whether claimant's statements were

credible. Unfortunately, the ALJ's explanation was perfunctory in that he simply stated,

"there is no credible evidence that the claimant's physical impairments would ever

require him to lie down during the workday." (R. 26.) SSR 96-7p is clear in its

requirement that the "reasons for the credibility finding must be grounded in the

evidence and articulated in the determination or decision." It is insufficient to make a

conclusory statement that "the allegations are (or are not) credible."[4] *Id.* We also note

that "the absence of an objective medical basis which supports the degree of severity of

subjective complaints alleged is just one factor to be considered in evaluating the

credibility of the testimony and complaints." *Scheck,* 357 F.3d at 703 (quoting *Polaski v.*

*Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984)).

To the extent that the Commissioner suggests that the reasons for the credibility

determination are implicit in the ALJ's thorough recitation of the testimony and medical

records, we disagree. "Nothing in Social Security Ruling 96-7p suggests that the

reasons for a credibility finding may be implied." *Golembiewski v. Barnhart*, 322 F.3d

912, 916 (7th Cir. 2003.) Additionally, the ALJ's decision to give Reynolds the "benefit

of the doubt" by limiting him to sedentary work with additional limitations is not an

excuse to gloss over the credibility determination.

Lastly, the ALJ failed to articulate the weight he afforded the brief testimony of

---

[4] We note that the ALJ made a similarly conclusory statement in his discussion of the vocational rehabilitation evaluation submitted by claimant. (*See* R. 25 - "However, there is no credible evidence that the claimant's COPD imposes such extreme limitations.").

claimant's sister, which we note is consistent with that of the claimant. In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity, such as family members, it is appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence. SSR 06-03p. Absent an explanation, it is impossible to determine if ALJ Thompson considered such factors.

Where, as here, we are unable to trace the path of the ALJ's reasoning, remand is required.[5] *Carlson*, 999 F.2d at 181.

## III.    CONCLUSION

For all of these reasons, Reynolds' motion for summary judgment is granted. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

ENTERED:

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: August 15, 2011**

---

[5] With the understanding that further proceedings will likely require additional testimony from a vocational expert, we need not address claimant's arguments on this issue. We note, however, that hypothetical questions posed to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record. *Simila v. Astrue,* 573 F.3d 503 (7th Cir. 2009).